**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Patrick M. KELLEY,
Defendant–Appellant.**

No. 80–1223.

United States Court of Appeals,
Fifth Circuit.
Unit A

Nov. 10, 1980.

Richard C. Arroyo, Brownsville, Tex., for defendant–appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff–appellee.

Before THORNBERRY, RANDALL, and TATE, Circuit Judges.

TATE, Circuit Judge:

We reverse, finding insufficient evidence that property used as collateral to secure a loan was moved from the designated premises with intent to conceal it or to defraud the Small Business Administration (SBA).

The defendant Kelley was convicted of concealing and removing from the mortgage–described premises, "*with intent to defraud,*" an air compressor, an air conditioner, and a sewing machine subject to a security interest of the Small Business Administration, in violation of 15 U.S.C. § 645(c). The statute provides for imprisonment of not more than five years, and/or a fine of not more than $5,000 as penalty upon conviction, if the value of the property is $100 or more. The district court sentenced the defendant to five years of supervised probation, conditioned upon good behavior, payment of a fine of $5,000, and restitution of $10,000 to the Small Business Administration payable at the rate of $250 per month.

*Insufficiency of the Evidence: The Standard of Review*

The serious issue of this appeal is whether the evidence sufficiently proves that the defendant Kelley had the requisite "intent to defraud" when he moved three items of property subject to the SBA security interest from their mortgage–described site in Brownsville to Michigan.[1] The defendant Kelley raised this issue at the close of the government's case; with reservations, the trial court ultimately concluded that a jury issue was raised. The defendant renewed his motion at the close of the case, along with other motions to dismiss that the district court likewise denied.

■ In reviewing the sufficiency of evidence in criminal cases, we are to view the evidence and all inferences that reasonably may be drawn from it in a light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Whether the evidence is direct or circumstantial, in our review of sufficiency we must accept all credibility choices that tend to support the jury's verdict. *United States v. Staller*, 616 F.2d 1284 (5th Cir. 1980).

The standard of review is whether, based on the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt. *United States v. Gonzalez*, 617 F.2d 104 (5th Cir. 1980). If the evidence viewed in the light most favorable to the government shows that a reasonably minded jury must have had a reasonable doubt as to an essential element of the crime, we must reverse. *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980). As we reiterated in *Gonzalez, supra*, 617 F.2d at 106:

[I]f the trial or appellate court is satisfied that the jury could not reasonably conclude that the evidence fails to exclude every reasonable hypothesis but that of guilt then the trial court, or on appeal, this Court must hold that "the jury must necessarily have had a reasonable doubt as to the inconsistency".

*United States v. Haggins*, 545 F.2d 1009, 1012 (5th Cir. 1977), quoting *United States v. Nazien*, 504 F.2d 394, 395 (5th Cir. 1974), cert. denied, 420 U.S. 964, 95 S.Ct. 1358, 43 L.Ed.2d 443 (1975).

*The Factual Background*

■ The defendant is charged with concealing and removing three items of property from Brownsville, Texas, (after his business and marriage failed), back to his original home in Michigan "with intent to defraud" the SBA's security interest in that property. Before we discuss the incidents upon which the government relies as creating a jury issue as to fraudulent intent in this removal, an overview of the undisputed factual background will be helpful for understanding the respective contentions.

The defendant Kelley and his wife operated a small automotive and furniture upholstery plant in Brownsville, Texas. In late 1977, Kelley applied for a disaster loan from the SBA, a type of loan that the SBA witnesses testified was based on need, without regard to the collateral. The metal building and land (valued at $2,960), machinery and equipment ($1,791), accounts receivable ($1,266), and inventory ($14,233) were subject to a prior security interest of $8,266. Nevertheless, on January 24, 1978 the SBA loaned Kelley and his wife $15,000 (the first monthly payment of $194 being

1. We do not regard the other issues to be substantial. Despite the appellant Kelley's contrary contentions: 1) The indictment set forth the elements of the offense charged sufficiently to apprise the defendant of the charges (*United States v. Bass*, 562 F.2d 967 (5th Cir. 1977); *United States v. London*, 550 F.2d 206 (5th Cir. 1977)), and no prejudice is shown by the technical misnomenclature by the indictment of the type of security interest involved; 2) the evidence of more than $100 value sufficiently, if sketchily, provides a basis for a jury finding to that effect; 3) the SBA had a security interest in the air compressor by virtue of the after–acquired–property clause in the security agreement; and 4) the showing made that the prosecutor had cautioned a defense witness out of the presence of the jury to tell the truth, upon penalty of perjury, did not justify an evidentiary hearing mid–trial, and we note the defendant did not renew his request for such a hearing following conviction.

due one year from date), secured by a security interest in (a) the machinery and equipment, (b) the inventory (raw materials and supplies now owned or hereafter acquired), and (c) the accounts receivable. Attached was a list of the machinery and equipment used as collateral for the loan; however, the security agreement also expressly affected equipment "hereafter acquired" for use in the business.

The security interest agreement also provided: "Debtor shall keep, store or regularly garage all Collateral at locations approved by Secured party *in writing.*" The government mainly relies upon this clause, in contending that Kelley concealed and removed the three items of equipment from the plant site in Brownsville, described in the security agreement as the place at which the equipment and the other collateral should be kept. The government argues that, due to Kelley's failure to notify[2] the government that he was removing the equipment when he abandoned the premises (the commercial bank that had the first mortgage–lien on the property foreclosed and sold it), he "concealed and removed" it "with fraudulent intent".

The business did not prosper, nor did the Kelley marriage. In early September, 1978, eight months after the SBA loan, the wife instituted judicial proceedings and secured an order restraining her husband (the defendant Kelley) from going around her place of work (the upholstery plant). On December 8, a divorce was granted, and Kelley was again permitted access to his plant; most favorably to the government, all of the equipment was still there. However, as Kelley's wife testified (as a witness for the government), virtually the entire inventory had been depleted in the ordinary course of business, without replacement, and all open accounts collected had been

spent in the operation of the business, during the three months in which she had operated the plant while her husband, the defendant Kelley, was barred from access to it. (There was about $40 left in the business account at that time, payments from which could be made by check signed by her alone.)

At the end of December, 1978, Kelley left Texas for his original home in Michigan. He testified he left what equipment remained in the plant, except for certain of the more valuable items, which he took to Michigan. As the testimony of the FBI agents reveals, with minor exceptions to be noted and not here relevant, all machinery and equipment subject to the SBA security interest had, at the time of the trial, been located as stored either in Michigan in Kelley's father's garage or else on the Brownsville plant premises. (The new owner, who had purchased upon the bank's foreclosure, initially claimed to the FBI that the SBA had no claim on them, apparently believing that his purchase of the building included the equipment stored in it.)

The items stored in Michigan included the air compressor, the air conditioner, and the sewing machine that are the basis of the government's charge of removal and concealment with fraudulent intent. The government did not produce any evidence, nor does it contend, that Kelley ever sought to sell or otherwise dispose of this stored equipment, or that he made any use of it. It apparently relies upon the premise that, by removing and "concealing" the three items of equipment in Michigan, Kelley had the power to dispose of the equipment to the prejudice of its security interest in it (which, however, was subject to the priming security interest of the commercial bank); so that thus the jury was entitled to decide

**2.** Kelley testified that he had telephoned the SBA attorney who had prepared the loan papers to inform him of his move, he being the only SBA employee he knew. In the government's rebuttal evidence, the attorney testified that he did not recall the call, and that he thinks he would have recalled it if made, and that he would have made an informal note on a yellow pad to forward it to the appropriate SBA office (since he had no function with regard to delinquencies) if such telephone call had been received by him. The jury apparently did not accept Kelley's testimony, nor can we, for present purposes; however, if Kelley's testimony as to this telephone call had been uncontradicted, the trial judge indicated he would have granted a directed verdict of acquittal on this ground alone.

whether the removal and "concealment" was with intent to defraud the SBA.

At this point, we note: By far the major part of the collateral securing the SBA note, were inventory (initially valued at $14,233) and accounts receivable ($1,266). The government's own testimony indicated that, during her three months' solo operation of the business, the defendant Kelley's wife had disposed of or consumed the entire value of these assets. The machinery and equipment, initially valued at $1,791, were a relatively minor asset of the business and of the collateral securing the SBA note, and on these assets the SBA security interest was primed by that of a commercial bank and, in some cases, also by that of other lenders. The relevance of this observation is with regard to the government's contentions that fraudulent concealment of the property possessed by Kelley may have been indicated by statements made by him, after his move to Michigan, that his wife had disposed of the bulk of the collateral.

*Events Following Kelley's Removal to Michigan*

The government's witnesses readily admitted that, when Kelley moved to Michigan in late December 1978, he had left with the new owner of the Brownsville plant his Michigan address and two telephone numbers there where he could be reached. They also admitted that, when they telephoned him in Michigan shortly after he left and upon subsequent interviews with him, he readily volunteered that he had taken at least some of the items subject to the SBA security interest with him and was in possession of them in Michigan. However, the government relies upon his statements to government representatives as being misleading or concealments as to at least the air compressor and the air conditioner.

The first monthly installment of $194 became due on January 24, 1979, within a month after Kelley had left for Michigan. No payment from Kelley having been received, the local SBA sent a loan officer to the Brownsville plant premises on February 12. The officer was informed of Kelley's Michigan address and telephone numbers, which Kelley had left with the new plant owner. Two or three days later, the SBA supervisor called Kelley in Michigan. Kelley informed the SBA supervisor, according to his recollection, that he had been locked out of his plant and had gone to Michigan, and that his wife "had kept" most of the equipment. According to the SBA officer, Kelley informed him "that the only equipment he took over there was just a sewing machine [the most valuable piece of equipment in the plant, initially purchased in Michigan several years before at an initial cost exceeding $3,000, although much depreciated, at the time of the loan] and some hand tools." Tr. 48. When asked if Kelley had told him anything else, the supervisor replied: "Well, it has been so long I don't really remember, but I think he mentioned he was aware of the debt, but that . . . he wanted us to . . . find out what was going to happen to the rest of the equipment, and at that time I didn't pursue it much further because my main concern was finding out where all of the equipment was." The SBA officer then reported the matter to Washington for further investigation.

On March 13, 1979 a letter was written by the SBA to Kelley accelerating the $15,-000 balance of the note and demanding immediate payment. The letter did not request Kelley's return of the collateral, or any information as to it.[3]

**3.** Indeed, despite the provision of the security interest agreement requiring the debtor, upon default, "to assemble and make available all Collateral at any place designated by Secured Party [the SBA]", the SBA employees and government witnesses testified that no such request was ever made to the debtor, Kelley. Under questioning by the court, the SBA supervisor admitted that he did not know whether the collateral was "worth a plug nickel", that

he did not know the amount of the priming bank security interest, and that, once collateral subject to prior lien was located, it was usually appraised and, only if sufficient in value to pay off the prior liens, would the collateral be foreclosed upon by the SBA.

While we do not necessarily find this evidence material to decision of the issue of intent to defraud the SBA, some perspective on the factual context may be shed by the circum-

On May 23, 1979, an FBI agent interviewed Kelley in a Michigan office of that agency. He interviewed him as to the list of property used as collateral for the SBA loan, in order to ascertain its whereabouts. According to the agent, Kelley informed him that his wife "had sold much of the property that was used in the business" and "that the property that had not been disposed of by his wife was currently in his possession being maintained at the garage of his father in Michigan." Through the agent's use of this method of interrogation (based on the list of collateral at the time of the loan), Kelley informed the agent that he had in his possession the sewing machine and the air conditioner that are the subject of this charge, as well as certain other minor items. He informed the agent that his wife had disposed of an air compressor, a Coca–Cola Machine, and a high pressure washer.[4] It is important at this point to note that the agent used the list of collateral at the time of the loan as the basis of his interrogation. Record, Vol. II, p. 165. It is important because the air compressor disposed of by Kelley's wife was a Sears model listed on the original inventory, whereas the air compressor that is the subject of the present charge was acquired for $300 in early 1978, after the loan, and was subject to the security interest only as after–acquired property. Thus, the FBI agent's testimony is devoid of any indication of misleading concealment by the defendant of the whereabouts of the SBA collateral.

On September 17, 1979, the FBI agent went with Kelley to the premises in Michigan where the SBA collateral was stored. He made a physical inventory of them. The inventory included the Montgomery Ward air compressor purchased by Kelley in 1978 after execution of the loan (to replace the then–inoperable Sears compressor, see note 4 above), but subject as after–acquired property to the SBA's security interest. Kelley voluntarily exhibited all this property as property of the business he had brought with him from Brownsville. When Kelley pointed out this piece of equipment as belonging to the business and as brought from Brownsville, the SBA had no knowledge of this unlisted and after–acquired Montgomery Ward air compressor.

This is the substance of the government's case regarding the defendant Kelley's alleged removal and concealment of a sewing machine, an air conditioner, and an air compressor with intent to defraud the SBA's security interest in them.

*The Denial of the Motion for Acquittal*

At the close of the government's case, the defendant moved for an acquittal because there was no evidence of intent to defraud the government. The district court's thoughtful and searching colloquy with counsel shows it concern with the thinness of the government's case. Record, II, pp. 190–202. The court initially stated:

stance that *all* the machinery and equipment (including that left in Brownsville as well as the items possessed by the debtor in Michigan), subject to a priming bank security interest as well as the SBA's, is shown by the uncontradicted testimony to have had a total value of not more than $2,100 ($1,791, its appraised value at the time of the loan, plus $300 for an after–acquired air compressor). At the time of trial, the priming bank debt exceeded $3,000, having been reduced from its initial $8,000 by payments made by Kelley before and after his move to Michigan. Since the inventory (initially appraised at $14,233) and accounts receivable ($1,266) had been disposed of by Kelley's wife before his move to Michigan, and since the land and plant sheds (initially appraised at $2,960) had been sold at about that time through the priming bank's foreclosure, the $2,100 worth of used equipment was the sole collateral left subject to the SBA security inter-

est, and that itself was primed by the bank's security interest in the collateral securing a debt of much more than $3,000 at the time Kelley moved from Brownsville back to Michigan.

4. As the government's testimony shows, Kelley's information as to these items disposed of by his wife had a basis in fact: the disabled Sears air compressor *initially* mortgaged, subject to a repair lien, was transferred to a person who paid off the lien; the Coca–Cola machine had been sold by her to pay off a prior bank lien, at the instance of a co–obligor on the note; and the high pressure washer, initially loaned to a third person (in whose possession it still was at the time of the trial), was the subject of Count II, as to which the defendant was acquitted. See below, "*The Steam Cleaner (High Pressure Washer)*."

"What says the government about the intent to defraud? The only evidence that I see here, Mr. De Luna, is that this man took this property or some part of it from Texas and up to Michigan where he is living and stored it in a garage.

"There has been no evidence that demand was ever made on him to produce this property, unless there is some exhibit I haven't read. There has been no evidence that anyone went out to get it and he wouldn't give it to him or he tried to hide it or he lied about it. . . .

"It's undisputed he was divorced, that his property was—that he was going broke, and he just packed it up and cut out and went back north where he came from. He didn't try to hide from anybody.

"I am very, very concerned about your showing of intent to defraud, and I think that is a necessary element of this case.

"What evidence do you have besides what I have already mentioned that this man attempted to defraud the SBA?"

The district court then rejected as mere breaches of contract the government's argument that the case was submissible to the jury because Kelley had failed to maintain the collateral at a specific place and had moved it without informing the SBA. The court eventually agreed that the defendant "used candor when he talked to the FBI" although adding, "but I can see why he would at that point."

Ultimately, however, admitting that the government's case on fraudulent intent was "skimpy", the district court decided it should be submitted to the jury. In reaching this conclusion, the trial judge relied (a) primarily upon the evidence of a government witness, impeached by a prior contradictory statement favorable to the defendant Kelley, as to Kelley's alleged attempted sale of a steam cleaner (high pressure washer), see next section of opinion below—but also (b) upon Kelley's initial statement in February, 1979 to a SBA supervisor that his wife had kept most of the collateral—as creating a jury issue as to Kelley's fraudulent concealment of the collateral with intent to defraud the SBA. We will discuss seriatim these two reasons for denial of a directed verdict of acquittal; we agree with the district court that, except possibly for these two factors, the evidence viewed most favorably to the government does not contain any evidence by which a reasonably minded jury could convict Kelley of removing and concealing the property with intent to defraud the SBA.

*The Steam Cleaner (High Pressure Washer)*

Count II of the indictment charged Kelley with concealing and removing a high pressure washer (referred to also as "steam cleaner" in the evidence) with intent to defraud the government. This, it should be noted, is the only item of the collateral as to which there is any evidence that Kelley attempted to dispose of rather than store it. However, *the jury found Kelley not guilty of this charge.*

The evidence as to the steam cleaner was that it had been loaned in late November to another business, either by Kelley or his wife (the evidence is conflicting). The owner of the other business (Sword) expressed to an employee an interest in purchasing it. In December 1978, just before he moved to Michigan, Kelley telephoned Sword in response to that interest, followed by two or three calls from Michigan, dickering about the price. No agreement was reached, and the steam cleaner was still in Sword's possession at the time of the trial. (Despite its knowledge of the whereabouts, the SBA made no effort to secure its possession, probably because a commercial bank had a priming security interest in the equipment.)

Sword, who testified for the government, admitted that Kelley had informed him of the bank's security interest and that the intention of the parties was that Sword would pay the purchase to the bank, thus reducing by $250–500 (the prices at bargain) the substantial debt owed the bank by Kelley and secured by this equipment (together with all the other collateral used by Kelley's business). In arguing for submission to the jury, the government argued that, contrary to the import of a prior contradictory statement by him (as well as to

Kelley's subsequent testimony at the trial), Sword was not informed by Kelley of the bank's security interest until he himself learned of it.

In any event, the jury found Kelley not guilty of any intent to defraud by concealing or removing this high pressure washer, as charged by Count II.

The main relevance to our present query, however, is that the district court denied a motion of acquittal on Count I, concerning three other items of equipment (the air compressor, the air conditioner, and the sewing machine) partly because an attempt to dispose of or conceal property *other* than that described by the indictment "would show intent ..., if the government can show that he was hiding items that they had the lien on—even though they are not in the indictment, I think it is just one ball of wax anyway." The trial judge stated that he would charge the jury that it could "consider his conduct with reference to other items to show intent in connection with this offense." By the same reasoning, the jury's acquittal of Kelley of any fraudulent intent with regard to the steam cleaner deprives his conduct with regard thereto of any justification for a denial of a directed verdict insofar as it is relied upon to raise a jury issue of fraudulent intent to conceal *other* items subject to the SBA's security interest.

*The February 1979 Telephone Conversation with the SBA Supervisor*

The other reason for the denial of a directed verdict given by the district court was that the jury might infer a fraudulent intent to conceal from the testimony of the SBA supervisor as to the contents of his initial telephone inquiry to Kelley as to the whereabouts of the equipment subject to the SBA's security interest. The latter called Kelley in early February at a Michigan telephone number and address that Kelley had left at his Brownsville premises to be given to anyone who was looking for him. In denying the motion for acquittal, the district court recalled that he had told the supervisor that his wife had the bulk of the equipment, despite his frank admission that he had some of it with him in Michigan; therefore, the court felt, the jury might infer an intent of fraudulent concealment.

The SBA supervisor testified from recollection as to a telephone conversation a year earlier, as to which he had not made notes. He stated that Kelley had told him he had taken to Michigan "just a sewing machine and some hand tools". When queried as to details of the conversation, the supervisor frankly admitted "it has been so long I don't really remember". R. II, p. 48. In our view, in the light of the record this testimony of a dimly recollected conversation is not by itself sufficient to permit a reasonably minded jury to find any intent to defraud the SBA security interest in the three items of property moved to Michigan, or any concealment of them. As previously stated, no other evidence in the record supports such fraudulent intent—to the contrary. The conversation itself reveals that Kelley frankly admitted removal to Michigan and possession by him of the major equipment (the sewing machine, see note 3) of the plant, that Kelley was concerned about the other collateral left behind in Texas, and that Kelley's response that his wife had retained most of the property securing the SBA loan was not inaccurate, if the SBA officer's query had been as to "collateral" and not (as he recollected) to "equipment."

Viewing the evidence most favorably to the government, it shows: Kelley took the property with him to Michigan, when he left Texas (with the business plant foreclosed or to be foreclosed), openly leaving his new address and telephone numbers. Kelley never made any attempt to dispose of or use this property used as collateral for the SBA; instead, he stored it in his father's garage in Michigan, readily disclosed his whereabouts, responded to all specific queries as to what property he had, and brought the investigating agent to the location, where among the stored property was situated the after–acquired air compressor of which, until then, the SBA had no knowledge. Against this evidence, the recollections of the SBA supervisor based on an

informal and admittedly not well—remembered telephone conversation of a year earlier, which can be construed as a non—misleading response to limited questioning, are not in our opinion sufficient to raise a jury issue that Kelley had any intent to defraud or conceal from the SBA the property taken by him to Michigan.

Thus, having viewed the evidence most favorably to the government, we nevertheless find that a reasonable minded jury must have had a reasonable doubt as to the fraudulent intent essential for conviction of the crime; therefore, we must reverse the conviction. *United States v. Forrest*, 620 F.2d 448, 450–51 (5th Cir. 1980).

*Conclusion*

Accordingly, the conviction appealed from is REVERSED.